The fourth district appellate court of the state of Illinois has now convened the Honorable James a connect presiding Good morning. This is our first case for 2105 9-0 People of the state of Illinois versus Clayton Watts Council for the appellate, please state your name for the record Joshua Scanlon Thank you. And for the Apple II John Zimmerman your honor. Thank you. You may proceed. Mr. Scanlon Thank you, your honor May it please the court counsel My name is Joshua Scanlon and I'm here today representing Clayton wants in his appeal and requesting that this court reverse his conviction And remand for a new trial The overarching problem with mr. Watts trial is that he was not in fact tried for the charge defense, but for being a bad person The state was permitted to take a case with only two possible witnesses to the offensive issue and turn it into a 19 witness three-day referendum on mr. Watts character The vast majority of the evidence presented during trial Dealt with issues that were either completely unrelated to the offensive issues or only tenuously related at best in Prejudicial effect Or to hold the state to its foundational burden The cumulative impact of these errors denied. Mr Watts a fair trial where they heavily tip the scales against him in a case that would otherwise have had very little evidence these evidentiary errors fall into two main categories first the overwhelming amount of other bad acts evidence and Highly prejudicial and lacked the foundation necessary to provide any probative value in regards to the first category of The other bad acts evidence admitted the most problematic was that admitted to show propensity under section 115 dash 7.3 of the Code of Criminal Procedure Mr. Scanlon was that issue preserved? It was not included in the post trial motion, so no your honor it was not it was not preserved Unfortunately counsel did not include either of these issues in the post trial motion And so it is under the rubric of plain error or ineffective assistance of counsel that we are approaching these these issues Now while the statute permits the admissibility of Propensity evidence in sex offense cases. It is still only admissible if its probative value outweighs its prejudicial effect in Making this balancing test the statute instructs courts to look at three factors proximity in time degree of factual similarity and other relevant facts and circumstances of Most import here are the latter two categories as they increase the prejudicial value and decrease the probative value Particularly were they in time? I'm sorry your honor. How proximate were they in time? Two of the allegations were within I believe a month or two of the offense Whereas one and a third allegation was over a year before before the offense The latter two categories, however are what way most heavily against the admission of this evidence Beginning with degree of factual similarity the propensity allegations were factually dissimilar in a few key ways Of less import is though are those differences in the surrounding situation such as The fact that LW's allegation involved the offense occurring in. Mr. Watts vehicle, whereas all of the other allegations involved it occurring in a bed or in a house somewhere else particularly. Mr. Watts bed Or that LW was not out drinking with. Mr. Watts and others beforehand where all of the propensity witnesses were drinking to excess along with. Mr Watts and others beforehand of more import are the factual dissimilarities that go specifically to the nature of the charge defense here First and foremost being that LW was a minor there was an age gap of seven years between her and Mr. Watts, whereas all of the complaining propensity witnesses were young adult women within two years of Mr. Watts age Second was that LW Alleged that she physically and verbally resisted. Mr. Watts, whereas all of the complaining propensity witnesses were blacked out or asleep. LW further alleged that Mr. Watts used force by pinning her down where none of the complaining propensity witnesses alleged any force being used against them and JN specifically said that he stopped as soon as she voiced displeasure and seemed confused. Of most significance here is that LW actually alleged a an act of forcible penetration here, which is different from what was alleged in the other propensity allegations in particular for DC and mm it is unclear what the actual act was Mr. Watts was alleged to have done. If any, there was certainly no clear allegation of an act of penetration by Mr. Watts in those two instances. These factual similarities significantly increase the prejudicial value the prejudicial effect of introducing the propensity evidence, but have even more important is the fact that the majority of the trial was focused on these propensity allegations. The case of people be LW is instructive here. There, the state admitted three witnesses to establish one propensity and allegation involving ES, while there was only one witness for the offensive issue, the complaining witness LL. The court said that the prejudice caused by this imbalance could not be overstated. Indeed, where the propensity evidence was admitted in such a greater proportion LW in that case was convicted, even though the court ultimately found that the evidence on the offensive issue was outright insufficient. The imbalance here was significantly worse than in La Monica 12 out of 19 witnesses were solely devoted to propensity, or almost two thirds of the testimony at trial, whereas only three witnesses LW and her parents testified solely in regards to the offensive issue, or less than one eighth of the testimony at trial, Mr Scanlon, to a degree with a sex offense, it's not uncommon that there would be. Very few witnesses to the crime. And so is this disproportionate evidence when you look at the number of other earlier offenses all that surprising in a situation like this. I'm sorry I'm sorry isn't that why the statute exists because it is hard. You know, he said she said sexual assault situation. You're this is basically there to help create more evidence for the jury jury or fact finder to way. Certainly, Your Honor, there's, there is that basis to it, but there's still a balancing that has to take place as to how much of this evidence can be allowed in. Certainly, there is, it would be reasonable to suggest that maybe some of this might be allowed in maybe one of these allegations. And a limited or comparable amount of evidence on that allegation compared to the amount of evidence being admitted for the offensive issue here that balance was completely skewed in favor of all of the propensity evidence. But isn't it being more than one offense that gives it its probative value. No, Your Honor, I don't I don't believe so I I think it gets probative value by the fact that there is this additional evidence that someone has to prove propensity. It is only valuable. First of all, if it is factually similar enough to actually show propensity, which I argue, at least two of these, if not all three of these are do not actually show propensity for the charge defense or for an act as alleged in the charge defense, where they don't have it. I'm sorry. Go ahead. All right, Your Honor, is one of the things that's present something that I don't think it's unique, exactly. But perhaps so unusual, the use of suicidal or self-harm language to induce a person to be a helpmate, to help me, to talk to me, to visit with me. Is that present in each of the let's just call them offenses now, even though you've made the point that the offenses themselves may be different, is that something that's present? Is that an overarching theme? No, Your Honor, that was that was not present. Any of the propensity allegations that were admitted for propensity, the only place that that was present was in the testimony of Madeline Wharton, who was his former girlfriend, in which there were no allegations, no specific allegations of sexual misconduct of some kind that was in that case, pure propensity evidence without a sexual offense to bring it under the ambit of the propensity statute. And in that case, there was no valid basis for bringing in those prior suicidal or self-harm statements because it only falls under the rubric of other bad acts evidence. It also didn't give any context because those statements were made at a vastly different time, years before the offense, a different person and in a different situation. So those statements absolutely were improper under that rubric. Returning quickly to the overwhelming amount of the propensity evidence here, the trial court's abuse of discretion in admitting so much propensity evidence here is shown by its choice, ultimately not to exercise discretion at all. The court ultimately accepted the state's assertion that it could overprove the propensity evidence repeatedly, even though it believed that the state was ultimately conducting a trial within a trial and that it risked losing the jury by doing so. The fact that it failed to exercise discretion evidence its abuse of discretion in this case. This overwhelming amount of other bad acts evidence heavily tipped the scales against Mr. Watts, where the remainder of the state's case boiled down to a classic contest of credibility between Mr. Watts and L.W. And thus, where the evidence was closely balanced for those purposes, this was heavily prejudicial to Mr. Watts and tipped the scales against him. Moving on to the second category of evidence here, which was the memes. These added to the accumulation of improper evidence in this case. The memes were not relevant to any question at issue without some evidence that Mr. Watts was in some way responsible for them. A good example of this is in the Supreme Court's case of People v. Pulliam, where the state was allowed to introduce evidence that a book entitled The Force of Sex was found in the defendant's apartment. The Supreme Court found that the trial court had abused its discretion, where it had no sound basis to find that this book was relevant without some evidence that the defendant owned or read the book. This is ultimately a foundational question here. Authentication is a conditioned precedent to admissibility and requires evidence sufficient to find that the item in question is what the proponent claims it to be. Thus, the memes here could only be helpful to the state if Mr. Watts was in some way responsible for their creation or dissemination. As such, the state was required to present sufficient evidence for the jury to infer that Mr. Watts had a hand in creating or promoting them. The most common way to authenticate this evidence would have been to present it through someone with personal knowledge of the memes or where they came from. The state presented no evidence. Like his girlfriend who said that he would belong to a chat room that did those memes, coupled with the evidence that the memes themselves were actually being recorded or documented as coming from his phone at the same time that he's having a conversation with his girlfriend on the same phone. You mean not things like that? No, Your Honor. And I would dispute a couple of those indications. First, Stein, who was the girlfriend with whom he was texting, specifically testified that she had never seen these memes and did not know. Sure. Right. I didn't say that. I didn't say that. I said that she said she knew that he had he was a member of a chat room that traded memes back and forth all the time. And then they coupled that with the testimony of the officer that did the examination of the phone to disclose that the memes are actually being transmitted or I don't know what the term is that they use at the same time or within seconds of the times that he's having this phone conversation or chat with his girlfriend. So it's all contemporaneous with a conversation he's having with his girlfriend. Yes, Your Honor. I'm sorry, Your Honor. On his phone. Yes, Your Honor, to to this extent, they appeared on his phone at that time. The important distinction here is we do not know how they appeared at that time. We do not know, based on the fact that they were just on his phone, that he put them there, that he had any hand in them arriving there or that they weren't sent to him by somebody else. The deputy or specifically testified that the extraction report, which had those creation and modification stamps. It was impossible to tell from the extraction report where these things came from. Sure, so the only thing the extraction report could say was that this is where they ended up at that time. And just so we're clear, Mr. Scanlon, a meme is created by maybe one person and viewed by thousands or millions, right? We're not really focused on whether he created the memes. We're looking at whether these memes reflected some insight on his part into the subject of the meme. Yes, Your Honor, to the extent that he would have had to, yes, had some hand in promoting or disseminating or otherwise approved. No. Well, I mean, he didn't have to send it to anybody else. You know, if you're signed up for a certain email list, you get those emails because you signed up. So memes are not that dissimilar that if you are receiving them from a certain source, you may continue to get them from that source. Isn't that right? Certainly, Your Honor. And if there were any evidence of that he signed up for, taking your analogy, if he signed up for a particular source and we knew that that source produced these kinds of memes, that might be evidence that he had some responsibility or some agreement with the concepts in these memes. We don't know whether he received the meme by email, by text, by viewing it on a web page. We just know that the image was on his phone. Is that what you're saying? That's correct, Your Honor. And we don't know where it came from or what hand Mr. Watts would have had, if any, in that arriving on his phone. Anyone with a smartphone these days is familiar with receiving texts or emails or something along or anything along those lines from others. And we may not agree with everything that we receive from our friends, family or associates. We'll take judicial notice of that. Certainly, Your Honor. So, most tellingly, however, here, the state itself admitted during its closing argument that Mr. Watts, that it could not prove that Mr. Watts created or even agreed with these memes. But despite Mr. Watts, them not being able to prove that Mr. Watts had any hand in their creation or modification or agreement with them, it still wished to use this to show what Mr. Watts was thinking. Without any evidence to establish that Mr. Watts was in some way responsible for these memes or agreed with them, the state lacked the foundation necessary to argue that they showed his state of mind. And thus, they had no relevance to the case. As such, the court abused its discretion in admitting them. These memes were also highly prejudicial to Mr. Watts, where the state utilized them at every stage of the trial, introducing them first in the opening statements, and then among the first evidence that it presented at trial during Deputy Orr's testimony at the beginning of the first day of trial when they were published to the jury. They were brought up again during Stein's testimony on the second day and described again and used against Mr. Watts during closing arguments. They were lewd and offensive and involved concepts such as necrophilia and bestiality, and undoubtedly were introduced in an attempt to cast Mr. Watts as a lewd and offensive person. Indeed, the state used them to argue that Mr. Watts had a twisted definition of consent and described each meme that they were supposed to be funny and that he was essentially laughing at the idea of consent. Where the case otherwise came down to a contest of credibility between Mr. Watts and LW, the state used these memes to argue that Mr. Watts' denial of the offense was not credible and should not be believed. The cumulative effect of the memes and the other bad-ass evidence here denied Mr. Watts a fair trial. The improper evidence shifted the focus of the trial from the offense it issued to Mr. Watts' character and immoral behavior, and permitted the state to essentially accuse him of having a twisted and unacceptable sense of humor. This attack on his character prejudiced him where there would otherwise have been very little evidence on the offense actually at issue, and it was used to attack the credibility of his denial. The overwhelming amount of improper evidence made this trial fundamentally unfair and unreliable, and as such, this court should reverse his conviction and remand for a new trial. Thank you. Thank you, counsel. We'll hear from you on rebuttal. Mr. Zimmerman. May it please the court, counsel. Good morning, your honors. My name is John Zimmerman. I'm with the Fourth District Appellate Prosecutor's Office. Here on behalf of the state, I plan on making a similar order of argument as defendant. Now, the state would first remind your honors that the defendant failed to preserve these issues, and as no error occurred, plain error does not apply. And in the proceedings below, this first issue regarding the Section 115-7.3 evidence, there was a motion in limine. There was a hearing on this motion in limine. There was a large amount of discussion regarding this evidence. Further, at this pretrial hearing, the defense attorney argued that the charge defense was not similar. However, all the other propensity evidence was similar. And the defense counsel's main arguments that they were dissimilar from the charge defense was because the victim in this case did not involve a road trip, and no alcohol was involved. As set forth in the state's brief, however, this was factually incorrect. There was a road trip, and alcohol was involved as the defendant was intoxicated. So the main difference between the propensity evidence and the charge defense is just the victim's age, which, based upon all the other factual similarities, the state would argue that that is not enough to prohibit the propensity evidence. Well, isn't the other difference that due to intoxication, the victims could not consent? Yes, Your Honor. Sorry for interrupting. Regarding that, the trial court noted that, yes, the other victims were intoxicated, but it was overall the inability to consent between the victim and the charge defense due to her age and the intoxication and the propensity evidence. Well, as to the intoxication issue, Mr. Zimmerman, the difference was that in this instance, the girl refused to drink. In all the others, they were willing participants in drinking. In this one, it was offered. He still was in the position of a known friend who then encourages them to get together and then at least makes the offer to drink, which she declines. Yes, Your Honor, but the state would still say there's a factual similarity there by him being intoxicated and attempting to, or successfully have the victims become intoxicated so they cannot consent. And then he commits his sexual assault on them. And in regards to LaMonica, the state sets forth in its brief on page 13 to 14, the difference between LaMonica and this court's reasoning in Kelly, which, although Kelly was prior to LaMonica, this court disagreed with that same reasoning. And the Kelly case stood for the proposition that the propensity evidence must more narrowly to prove the defendant's propensity to commit sexual offenses. And that's what occurred in this case. Although there are some factual distinguishes, or although some factual, there are differences overall, the factual scenarios show that the defendant has propensity to commit the sexual offenses. Further, regarding the second issue, which is that the propensity evidence overwhelm the trial. Again, the defendant forfeited these issues all but the DNA issue. Our appellate court has held in Walston that the state has a compelling reason to introduce thorough evidence to establish the defendant's propensity. And this court agreed and Bates and stated that the danger of an unfair of unfair prejudice from a male defendant in the context of a section 115 case, as opposed to common law, other crimes case is greatly diminished. This reasoning makes sense as Justice Doherty pointed out that section 115 explicitly allows this propensity evidence. And in regards to factual similarities, defense counsel also conceded that this was all close and temporal proximity. So one of the factors has already been established by concession. And the other one, based on the state's argument, they were factually similar enough to allow the propensity evidence. Here, the record shows the trial court utilized its discretion and weighed the probative value versus the unfair prejudicial impact. Again, there were motions eliminated regarding this evidence and a pretrial hearing. And defendant also takes issue with the state not distinguishing Smith. However, Smith is entirely irrelevant. In that case, the trial court found there was no abuse of discretion. I believe the propensity evidence had a temporal proximity of 35 to 41 years difference. And then there were other victims that were 25 to 35 years difference. And the trial court didn't allow that in an appellate court of form affirmed based on the highly deferential standard of abuse of discretion. Additionally, defendant asserted in his reply brief and today on appeal that the record shows the trial court never weighed the pressure of prejudicial impact of the propensity evidence and that it did not believe it had discretion to limit that evidence. And the state would just note for this court that after the state rested below, the trial court explicitly stated that it determined the evidence was permissible, relevant, material, and that the state laid the proper foundation for its admission. This is in the record on page 618. And this is again, also in addition to the pretrial motion and liminese hearings on said motions and subsequent written orders. And regarding to the trial court skepticism of the DNA and the statement on the mini trial, the record makes clear why the state wanted to introduce this additional testimony regarding the DNA evidence. And this was because the initial person who was testifying regarding the DNA would only testify as to a match being, I believe it was one in 30. However, the context of the DNA test as a whole with the additional testimony shows, even though it's one in 30, based on the context of the test and the geographical area and additional concerns, one in 30 was much more likely than defense counsel was arguing that it actually would be. And when the state did introduce this initial DNA testimony, defense counsel did in fact make the arguments that the state warned the trial court that it would make. And so the state's proposition that it was proper for the state to be able to provide additional context for this DNA results. Defendant also argues the sheer amount of witnesses regarding the propensity evidence was improper. Upon our review of the record, the state would disagree. Although the number of witnesses may have arguably been quantitatively large, the testimony of those witnesses was qualitatively small. In other words, defense counsel here is counting the number of witnesses. However, if you count the number of transcript pages devoted to the charge crime, it was 209 pages in the transcript. And then if you count all the additional testimony throughout the trial, some of that involved the propensity evidence, it was around 284 pages. But this also included foundational issues, chain of custody issues, corroboration of the other victims testimony, the video interview of defendant and additional testimony regarding the memes. So if we're going to play this game of counting the number of witnesses, then I think you should also evaluate the number of pages that was that these witnesses testified because it ultimately comes out to around one to one ratio, which in the state's view is sufficient in cases such as these where section 115 allows this testimony to come in. As a result, the state's position is that defendants continual reliance on the number of witnesses is somewhat disingenuous as to the amount of testimony was not more overwhelming than the testimony regarding the charge crime. Importantly, as stated in Smith, several instances of misconduct might be needed to establish propensity in some cases, and it will be all it will often be difficult to determine how much is enough and how much is too much. And here upon a total review of the case, the record does not show that the trial court's ruling was arbitrary or fanciful or unreasonable. Thus, no abuse of discretion occurred. There's an additional argument regarding Madeline Gortney's testimony about the suicidal intentions. As argued below, this evidence was relevant to show how the defendant in the past used threats of self-harm to manipulate his girlfriend into doing what he wanted. And even assuming if your honors disagree that this was properly admitted, as this was not a properly preserved, plain error analysis does not apply because as previously just argued, the evidence in this case was not closely balanced. And this was not an error that would have contributed to the guilty verdict as it was cumulative based upon the charge. The case that was charged here, the victim's own testimony also stated that defendant discussed these suicidal tendencies. And regarding this testimony that was allowed, the trial court had the state on a short leash regarding how far the questioning could go as to this. So for these reasons, the state would request this court affirm the trial court's judgment regarding the section 115 evidence. Defendant also argues counsel was ineffective, but the state's position is simple. No errors occurred, so counsel could not be ineffective. Regarding the memes, again, this was not properly preserved. There was no error, so the state would argue plain error analysis does not apply. This is reviewed under abusive discretion. This is, again, another motion and laminate issue that was discussed prior to trial. There were lots of hearings on it. And as your honors are aware, the burden of proof for authentication is slight, and the rules of evidence only require evidence sufficient to support a finding that a matter is what a proponent complains or what its proponent claims to be. And authentication requirements tend to be liberally construed in favoring admission of evidence. And as the state argued in its brief, rule 901b4 further supports the authentication and admission of these memes. Mr. Zimmerman, we don't really know the route by which that meme got on his phone. Is that fair? I think that is a correct characterization, your honor. So it could have been somebody sent it to by an email and he looked at it and so that downloaded to his phone. It could have come by a text, similarly. It could have been from a social media site that pushes content. We don't know if he saw it. We don't know if he read it. Do we? The state's position is we presented sufficient authentication, authentication evidence for the memes. What have you authenticated? What is authentic about it, other than the fact that it was found on his phone? There was the forensic extraction report that showed the file that it was located on his phone. Okay, so we know where on his phone it was located. What beyond that did you authenticate? There was testimony that the defendant was texting his girlfriend the exact same time the memes were created. His girlfriend testified the defendant would often send and receive these memes from his friends. Orr and Shumley also testified the meme pictures were what they claimed to be. That is, they were located, extracted, created, and modified on his phone. Detective Orr did testify he didn't know what the terms created and modified meant. However, defense counsel failed to actually ask the forensic expert, Shumley, as to what these terms meant. So the state's position is we presented enough initial evidence to authenticate it, and then the defendant had the opportunity to challenge the genuineness of it and failed to do so to the witness who actually would have been able to provide that additional insight. Well, he could hardly dispute that it was on his phone. The question about authentication is only part of what Justice Doherty is asking, I think. Did he read it? Did he like it? Did he understand it? Did he even glance at it? Yes, Your Honor. I believe through the direct evidence that is testified, there's also the circumstantial evidence that can be utilized. And in this case, based on all that evidence, it was located on his phone, which is a private device. Most people use passwords to get into. You can infer that he was aware what was on his phone. This isn't the case like people versus Kent, where there's a random social media profile that is difficult to properly authenticate. This was his personal device that he was utilizing. His girlfriend provided testimony that he often sent these memes. What does these memes mean? Memes or memes on this subject? Sending memes is or sending or receiving memes can be, you know, multiple things, I would assume. My understanding is the testimony that it was created and modified on his phone is sufficient for foundational and authentication purposes, simply because Detective Orr testified he didn't exactly know what that meant doesn't negate the fact that the forensic support stated they were created and modified to the state's position. That doesn't have anything to do with these memes. What does that mean? Are you trying to imply that her saying he receives these memes all the time, that that is the character of the memes that he receives? Because receiving memes on your phone doesn't prove anything. I would state that receiving memes on your phone and then regarding all the other additional evidence that was presented, you can deduce that these memes meant memes such as the ones that were at dispute in this case. Well, it would have been pretty easy to ask the witness that. By these memes, you mean he's fascinated by this subject or he was obsessive about this subject or just that he there are other kinds of memes, aren't there? Yes, your honor. Well, these memes could mean memes of anything. That is true, your honor. But the state would again reassert that that testimony along with the extraction report, along with the testimony from Oren Shumley is sufficient to show that the three memes relevant to this case were properly authenticated. Well, except we don't know what other memes were on the phone, right? It could be cats and babies and whatnot, right? That is correct, your honor. So what was the state's burden beyond the threshold establishing that they were on his phone and that they were part of or at least present at or about the same time that he was talking with his girlfriend? Well, to satisfy the authentication requirement, a proponent needs only prove a rational basis upon which the fact finder could conclude the exhibit did in fact belong to the defendant. Okay. So after that, then it became the defendant's didn't agree with them, or whether she meant these memes in particular. I mean, that's for the defendant to attack, isn't it? Yes, your honor. The state agrees. And along those similar lines, the state questions, I apologize, why defense counsel did not ask the same questions that Shumley or as to or as he did to Shumley, who was the forensic expert, he could have provided an additional basis on what created to or modified meant. And the states... The Supreme Court case regarding the book found in the defendant's residence. The book in the residence is entirely different, your honor. As I previously mentioned, a cell phone, most people have a passcode on it. You don't carry a book around in your pocket and have all these private things within the book. It's a cell phone. I'm not sure of the year of that case, but I'm assuming it's back in the 80s. I would suggest to you that there are more people capable of putting things onto your cell phone by email, by text, by social media, than can put anything into that book, right? The author certainly did. But beyond that, it's a closed book, no pun intended. So, I mean, you're right. A phone is different, but we're not saying somebody went and wrote something in the book. The Supreme Court was concerned that we were imputing the content of the book to the defendant when it was just in his home. Why is that not applicable here? Well, as argued in the brief, defendant seems to be creating some new requirement that the state has to show that defendant endorsed the meme. All that is required pursuant to the rules of evidence is that there's a rational basis that the fact finder may conclude that the exhibit in fact belongs to the defendant. That's very clear based on the evidence here. How do you square that with the book then? Because there was a rational basis to believe the book belonged to the defendant who was in his house. So, again, this is with the other additional direct testimony, circumstantial inferences based on the words created and modified. I don't know. I'm not sure if that's correct. The state's position is that you can get a picture and then edit in a group chat and just add words to the picture in two seconds. They can create and modify the meme. That is what the state's position would be, that extraction report. But we don't know what the modification is. We don't know if it's a modification with saving it with the word download one instead of whatever it was named originally. That is correct, your honor, and the state would assert that defendant could have further challenged the genuineness of that information after the state properly authenticated it and the defendant failed to do so. And again, he failed to preserve this on appeal, so he didn't raise this specific argument below regarding the creation and modification argument. The state put within its brief this should be forfeited for these reasons because we are getting confused based on the lack of the record that defendant failed to create. The state's position is we presented enough authentication foundation for the document for rational prior fact to determine it belonged to the defendant. This wasn't a people versus case where this could have been someone else's phone. This was clearly the defendant's phone. And based on all the other testimony, whether the girlfriend testified these memes meant the sexual memes or memes of cats and dogs, you can still circumstantially deduce that. Would a rational prior fact determine that it belonged to the defendant? Thank you, counsel. Are there any more questions of counsel? All right. Rebuttal, please, Mr. Scanlon. Thank you, your honor. First and foremost, to address the meme questions that we were just the state suggested that we know that they were found on the phone or we know where they were found on the phone. We don't actually know where they were found on the phone. We know they were on the phone somewhere. We don't know what app it came from. We don't know what service it came from. We don't know whether it was downloaded. Ultimately, we don't know where on the phone it was because the extraction report didn't provide that information. More specifically, as far as whether or not it came from those have been good questions for the defense counsel to ask. I'm sorry, your honor. Wouldn't those have been good questions for defense counsel to ask once it was established that they were on his phone? Well, your honor, unfortunately, the evidence presented by the state kind of prevented counsel from asking further questions because the person who testified about the memes deputy or didn't know and didn't have an understanding of that. And Kyle Chumlee hadn't reviewed any of the extraction information and couldn't provide any further detail to the extent that he might have been able to provide some further information as to what this looked like. And his answer is kind of so you don't think there's any value in front of a jury for the expert to be questioned and have to respond? I don't know. Could these have come from? Can you establish, Mr. Expert, that these have come from my client? No, I don't know. You don't think that's got any value in front of a jury? Certainly, your honor, that that might might have some value, but I think Chumlee's testimony suggests that he wouldn't have been able to answer that question in that he specifically said a couple of times that he hadn't reviewed the evidence and he couldn't tell you for sure without further information about the type of phone or the version of at the end of the day, it was the state's burden to provide sufficient foundation for this information and not defendant's burden to establish foundation that the state hadn't provided. Well, there's there's where I think our our disagreement lies in that what constitutes the threshold necessary for admission versus what might be a good attack on its authenticity for cross-examination. Well, and for that, your honor, I think this the cases of Kent and the one on which it relied, Vayner, provide the reason that this was the state's burden because the burden for authentication is based on the purpose for which that evidence is being admitted. The state's purpose in admitting this evidence was to say it showed what Mr. Watts was thinking. In order to establish that purpose, they had to establish some reasonable basis from which the jury could infer Mr. Watts had some responsibility or agreement with these memes. In order to do that, it had to present some additional evidence to show that responsibility. And I would like to also correct the fact that Stein specifically testified not only that she never saw him sharing off-color or politically incorrect memes or anything of this particular nature. When the state says these memes, that is not the words that Stein was using when she gave her testimony. She didn't testify to him having memes like this. She testified that he just traded memes generally in this group chat. Also, the creation and modification stamps, to the extent the state tries to rely on that modification, they were at the exact same time. This suggests that it was not, in fact, modified, but creation and modification were the exact same time there was no modification on his phone. The extent the state suggests he could have modified it, that is without evidentiary support. Going back quickly to the number of pages involved in the testimony in this case, the state suggests that there were 209 pages of testimony on the offensive issue. And that, I believe, is stretching what happened. Of the 12 out of 19 witnesses who testified solely about propensity allegations, this was about 213 pages of testimony. The testimony of the three witnesses who testified only on the offensive issue, LW and her parents, was about 91 pages of testimony. The remaining three witnesses who actually provided some testimony regarding either the offense or the propensity were Orr, Gwartney, and Stein. Deputy Orr gave about 86 pages of testimony, some of which was about the investigation, including, I see that my time is up. May I just finish that? Yes. He testified also about the propensity witnesses and the meme stuff. And Gwartney and Stein also testified in part about propensity. Because that was mixed, that heavily overbalanced the case. And I ask that this court remand for a new trial. Thank you. Thank you, counsel. We'll take the matter under advisement.